and we'll turn to the day calendar. Have a nice day everybody. Kulmatov against Jefferson v. Sessions. Good afternoon. My name is Ray Fasano. I represent the petitioner, Mr. Kulmatov, in this case. There are two intervening cases that are both precedents from the agency and from another circuit that bid directly on the outcome of this case. The first case is matter of A-B. The citation to that is 27 INN decision 316. That was decided this past June. And the other case that is almost directly on point is Rizalish v. Sessions. It's a first circuit case that was decided in July, 895 F3rd 154. The importance of these two cases as it relates to this circuit's precedent in Bescovich are two things. One, the issue of when the government is responsible for the actions of a private actor. In Bescovich, what this court said was that you have to look at the context of the persecution. The particular facts of Bescovich are that there was a detention by an authority and there were beatings while in detention. A narrow reading of Bescovich would say you could only have persecution if there's a government detention along coupled with the beating. But I believe that Bescovich is applied more broadly in looking at the context. Here, the context would be the country conditions in Kyrgyzstan that are extensively detailed in the background materials that demonstrate... Is there anything specific with respect to the mistreatment by others of your client that's attributable to the government or what the government did? There is. Thank you, Judge. It's the unable or the unwilling standard. What the Board of this Court knows from reading the briefs and the record, there were three beatings, not two. The Board got that wrong. There was a beating at the cafe when he was with his friend. There was a beating when he walked his friend home that resulted in Mr. Kolmatov being hospitalized for two weeks. And then there was the beating at his mother's sewing factory where he had to witness his mother being beaten on account of being Uzbek, and he himself was beaten. There was an investigation done by the police, but there's one point that both the immigration judge and the Board of Immigration and Appeals has overlooked, and I like to... This is like Perry Mason's smoking gun, and that is nobody addresses the fact, and this is at page 91 of the record, that Mr. Kolmatov gave the police a description of the vehicle. It was a black BMW, and he also gave, quote, I gave them the car plates, close quote. The reason why the immigration judge and the Board of Immigration and Appeals said that the government is not involved in this, that they were actually willing to help Mr. Kolmatov, was that they couldn't identify the assailants. They came to a dead end. There were no more leads, and because they couldn't identify the assailants, that's why they couldn't prosecute the individuals who had beaten Mr. Kolmatov and his mother, but nobody addresses the fact that the car plates were given. Now that's a significant lead. They would have at least known who registered the car, who owned the car, who the individuals perhaps were identified that would have been in that car. So I want the panel to take a close look at that point. How do we know that the police did not follow up on that? Well, we don't, and that's the point, because what happened was when he was in the hospital, that's when a report was taken by the police. They apparently somehow referred to a special investigations unit, but nothing else came of it. This is why the case of Rosales from the First Circuit is so important to the outcome of this case. In Rosales, the applicant or the petitioner there was a small business owner. He was confronted by Mexican gangs who had extorted him and his family. Instead of giving in to the gangs, they shut down and shuttered the business, and five days later they reopened the business. Five days later in Rosales, they find their son murdered. The police investigated it. They located the body. They did an autopsy. They questioned witnesses, and this is why the unwilling or unable standard is very important. In Rosales, the government was able to show that the Mexican authorities were willing to help, but they were unable to protect the individual. That's exactly the facts in this case. Whether the Kyrzyk Police Department was a distinct separate element as to whether the police are able to protect Mr. Kolmatov, and clearly the record shows that they were not. And that's why I want this court to take a look at the Attorney General's decision in a manner of AB. It's relevant here for two reasons. One, the definition of persecution, which the Attorney General in June said, you need intent to target a characteristic. The level of harm must be severe, and the harm must be inflicted by the government, by persons or organizations that the government is either unable or unwilling to control. The First Circuit in Rosales criticized the Attorney General's decision in AB because it conflated unwilling or unable, and I've spoken to counsel for the government on this issue, and I think that these intervening cases justify a 28-J letter, and I want to brief AB and Rosales and demonstrate to this court the relevance of those decisions. Thank you. Thank you very much. Ms. Clay. Good morning. May it please the court, my name is Sharon Clay. Good morning, my name is Sharon Clay on behalf of the government. Okay. The board's determination that petitioner failed to meet his burden of proof for asylum is supported by substantial evidence. The harm that petitioner suffered did not rise to the level of persecution when considered in the context in which the harm took place. The board also found that the petitioner failed to show that the government was unable or unwilling to protect him and failed to demonstrate a pattern or practice of persecution of similarly situated individuals. In regard to the past persecution claim and the rise in level of persecution, this court has held that the difference between harassment and persecution is a matter of degree, and each case must be decided based on the context in which the harm occurred. In this particular situation, harm in this case was severe in both incidents, wasn't it? Yes, the harm was severe, but when you take the harm in context, it doesn't necessarily rise to the same level of harm that other individuals have suffered. While it may not have risen to the harm that other individuals experienced, this was severe harm in both cases, right? That is correct. The difference between the cases that the board cited in the case present before you today is that the cases that the board referenced for support of its decision actually only found animus alone that was the basis for the actual harm that the petitioner had suffered. In this particular case, the harm was exacted on petitioner not only on animus, but also for some other factor. For example, both of the incidents when he was battered at the sewing shop and at the cafe, the petitioner actually was targeted after he tried to defend somebody else. It wasn't that he was the initial target. There was ethnic animus in both incidents. That is correct. Doesn't the case come down to whether the local government was unable or unwilling to protect the petitioner? It does come down to unwilling and unable. Here, the board actually determined that the government was willing and able to protect him because when petitioner filed his complaints with the police department, they actually took action. In one of the situations, they compiled all the materials and they forwarded it to a crimes unit. In the other instance, they informed them both times by letter that they were actively engaged in investigating the particular crimes. They're still investigating the second incident at the sewing factory, aren't they? Yes, they're still investigating. There's been some indication or at least the police department has indicated and petitioner has testified that he is under the belief that they are currently still investigating the particular crimes. The difficulty they've been having is because they didn't get an identity of the attackers. I recognize that petitioner providing a license plate should have changed their ability to be able to find it, but that would be speculative because as petitioner also testified before the board, he said that the Kyrgyz nationalists were very poor. Then the question becomes if you're going to speculate, would they be driving around in a BMW? Maybe the BMW may have been stolen. We don't know enough factors about this license plate in the car to be able to say that the license plate would be enough information for the government to determine who actually did the attacking. Also, one of the issues that I wanted to bring up about the unable and unwilling is that not only did the police make efforts to identify the attackers, this court has regularly decided that non-action was sort of the basis for not finding that the government was willing or able to protect the individual. With regard to the pattern or practice of persecution claim, the documents in the record do very little to support. As a matter of fact, most of the claims that he has alleged, the reason that was highlighted by the agency is that the harm that's actually, well, there's 29 documents. Out of the 29 documents, only five of them even have anything to do with Uzbeks in the region. If you identify or you review those particular documents, those documents actually reveal that the harm that a lot of the Uzbeks did experience was in the southern region of Kyrgyzstan. The petitioner is actually from northern region in Bishkek. It also reveals that the people or the Uzbeks who were actually targeted at the time were actually being targeted in reaction to the conflict that was taking place in 2010. There isn't really anything in the record to establish what the circumstances or conditions are in Kyrgyzstan as of today. What we do know is that petitioner's family has remained in Bishkek without any harm, but the record seems to be relatively stale because, as I said, it talks about the government at the time of 2010 and 2011, and we haven't seen anything since then to suggest that he has any real fear of future harm upon his return to his native country. What is the status of these two petitioners? The status of the two petitioners? Kulmatov and... His wife? Yes. The status is that she's a rider on his application before the court. Where are they and where are they going? Well, the court designated Kyrgyzstan as a country of removal for the husband, and the wife was designated to be returned to Russia. Where are they now? I'm not sure. I'm assuming... I know they're probably not detained, but I don't know where they are at this particular moment. Perhaps counsel might know where... Mr. Fasano may know. Yeah, may know. That said, one of the other issues that was raised by the petitioner was that the board was required to remand a case based on nexus, and I made the argument, or our position is that nexus was an alternative finding that the immigration judge made that the board didn't necessarily have to adopt or accept. It wasn't part of the calculus that the petitioner failed to meet his burden of proof for persecution overall, and that's made very clear when you actually read the immigration judge's decision, where the immigration judge says that he makes an independent finding of not rising to the level of persecution, and then goes on to say, even assuming you could meet that past persecution, that that claim would fail either because of the inability of the government to protect him or because there was no nexus. As we've seen in the board's decision, the board rejected nexus determination and conceded ethnicity was the basis or one of the motives for the harm, and still concluded that petitioner failed to meet his burden of proof. My time is almost out. That said, given that the context of the harm, and I didn't get into that, sort of, but no reasonable fact found it would be compelled to conclude that he suffered a requisite harm, and even if this court was to find that this was a very close case or that this case could have been decided differently based on a substantial evidence standard, the court should decide in favor of the board. Thank you very much. Mr. Fasano, maybe you can begin by telling us where your client is. Yeah, they're in Brooklyn, and they both reside in Brooklyn, and they have overstayed their authorized presence, so they have unlawful presence at the moment. They're not detained? No, they're not. They're at liberty. Two things. First, the government seems to suggest, I think, I don't know if it was done purposely or not, but the government seems to suggest that the motivation would have been for his beatings were because he intervened when his friend was accosted at the cafe, and that he intervened when his mother was being extorted, but the board clearly says, and I think the immigration judge did as well, that both of these attacks were motivated for ethnic hatred, so it has nothing to do with financial gain. In fact, the board corrected, and footnote three of its decision, the board corrected the IJ, the immigration judge, by saying that the attack on the mother was not financially motivated by thugs, it was racially and ethnically motivated. The government also brings up the point of context. It would seem to be the theme of her argument. This record's context shows a government or a country that tolerates religious discrimination, ethnic discrimination, racial discrimination. There may only be five articles or so that address ethnic tensions and ethnic persecution, but they take up something like 100 pages worth of the background materials. So if you want to look at the context of these attacks, this is a country that has a schism between the Kyrgyz and the ethnic Uzbeks, who clearly manifest their ethnicity by their appearance. That was made in this record. The real, I think, most difficult question here is, there may be, we know of other countries in which there's a great deal of ethnic problems, but the question is the government involvement in this case. Thank you, Your Honor, because that goes right to my point about what I think is the most important issue here and why I think we can get guidance from the circuit on this point. What is the unwilling or unable standard? There is no precedent from the Second Circuit on what is unwilling or unable. In fact, I've looked at all the circuit decisions, and your clerks could do the research as well, but they will find that the only circuit that's addressed, whether these are distinct terms, post matter of AB, is the Rosales case that I cited. And that's why I would, again, respectfully request that my application for a 28-J letter be granted, and I'd like to take the opportunity to submit that. When would you like to do that? One moment, Your Honor. I also, just for the record, have my associate, Zain Khan, with me today. Your Honor, may I have 14 days? Fourteen days. All right. And I've also advised my adversary about my request for a 28-J before argument. Oh, thank you, Your Honor. All right, so that would be October 16. We'll expect your letter by October 16, and then the government will have until October 23, a week from thereafter, to respond as they think appropriate. All right, thank you very much. Thank you, Mr. Fasano.